Case 16-6059 Norfolk Co Retirement System v. Community Health Systems Inc Oral argument not to exceed 15 minutes per side Ms. Hart for the appellant Good morning, Your Honors. I'd like to reserve five minutes for rebuttal, please. That's fine. May it please the Court, my name is Barbara Hart of Lowy, Dannenberg, Cohen & Hart. I represent the plaintiff appellant, the New York City Pension Funds. They're the police, fire, and teachers' retirement assets, and I am here accompanied by Richard Simon, counsel from the Comptroller's Office of the City of New York, counsel to the funds. The funds were appointed lead plaintiff in this case after having substantiated that they suffered the largest economic loss of any of the applicants. They documented that with their trading history in Community Health Systems stock and substantiated their losses related to the disclosures by showing the loss in value of their purchases and sales during the relevant period. Economic loss was also alleged as to the class as a whole at over $890 million due to the corrective disclosures. Those are specifically set forth in the complaint. Judge Sharp upheld this case on every element except loss causation, and I would zero in not on our allegation of economic loss, but rather the issue that he dismissed on vis-à-vis loss causation, which was very narrow, and that is the quality of the disclosure. He held that the quality of the disclosure was not sufficient to allege loss causation, and I would suggest that that's inconsistent with Dura, Supreme Court authority Dura. It's inconsistent with the Sixth Circuit's recent holding in Freddie Mac. It's inconsistent. What does Dura say that shows Judge Sharp was wrong on this point, on the corrective disclosure and allegation in the complaint? Dura says that the pleading of loss causation is not onerous and that you have to substantiate that the plaintiff suffered some economic loss due to the revelation. So in that instance, there was an instance. I thought you just narrowed the case down correctly to this corrective disclosure issue, and I didn't think Dura had a lot to say on that point. What it does say doesn't seem very helpful to plaintiffs, so it doesn't seem like a great case. To me, the whole problem is what's a corrective disclosure and what do we do with civil complaints or investigations. I guess when I look at all the cases, particularly the court of appeals cases, they seem to all be kind of pointing in the direction that an allegation is an allegation. It's not an acknowledgment of fact or truth. Am I right in thinking the prototypical corrective disclosure is the entity, CHS or whatever it's called, saying in a press release, we made a mistake? Isn't that the prototypical corrective disclosure? Not in litigation, but that's usually how it happens, right? The entity says, oops, we were wrong about that, or we fired somebody, we fired the CFO because they made this mistake. Isn't that the prototypical corrective disclosure? Well, I think that in the Sixth Circuit's decision in Freddie Mac, this court cautioned that we don't want to await an admission of an error or a fraud from the defendant, that that would allow too many defendants to escape liability. I don't understand what the risk is in waiting until the company actually says they screwed up. I mean, you can't bring a five-year statute of limitations. You can't bring it until it's accrued. And if you don't have the proximate cause problem solved with the corrective disclosure, the time hasn't run. So I'm trying to figure out why we have to jump this so early. Well, Your Honor, in this instance, the company ultimately did settle with the Department of Justice for $98 million. The settlement says what these settlements all say, which is not committing any wrongdoing. Right. There was neither admit nor deny. But that has to do with the underlying fraud, Your Honor. And what we're alleging is a securities fraud. And a securities fraud, the proximate cause that we try to isolate in a securities fraud case. It's a lie. You said one thing in a statement filed with the Securities Commission. And then it turns out it was a lie in the market response. Right. So it's not the underlying. I agree with you, Your Honor, with all respect. And what the lie here was the crucial omission. So he upholds Paragraph 8 and Paragraph 10, if I may. Paragraph 8 and Paragraph 10, the core omission was the failure to disclose the standardized use of the blue book. And on April 11th, on the day that this civil complaint is filed, right, so if we want to say that Tenet discloses the blue book and Tenet delineates the ways in which the blue book diverges from Industry Standard, Interqual, and Milliman, and it delineates the four categories in which it diverges, that same day, CHS admits for the first time that it uses the blue book. CHS, it doesn't make it untruth, un-new fact, because it was in a civil complaint. And at a minimum, once CHS adopts it as a truth and discloses it on the same day, CHS says, yes, we use the blue book. By the way, we are in the process of abandoning the blue book. We're transitioning to the Industry Standard. That heightens the credibility of the allegations of the Tenet complaint. One, it makes the blue book a fact. Two, Tenet said the blue book- The blue book a fact before the Tenet complaint? It was an undisclosed fact. It was the core- Publicly registered somewhere? Okay, so yes, I agree with Your Honor. Indeed, today, what we should be talking about is whether or not there was truth on the market about the blue book. Let me just, if I can just jump in for a moment. Aren't there cases that say third parties can effect a disclosure? Yes, Your Honor. I thought they concede that in their brief. They do, indeed. Investigative reporting? Investigative reporting, analyst reports, Wall Street Journal articles, complaints. But here we have that. And then we also have the concession by the company. So we do have that, which Judge Sutton is searching for, which is the concession by the company on the same day. And the 36% stock drop on the largest volume of trading history. We understand what happened that day. I just want to ask you just one targeted question here. So you're saying you disagree with the district court. You would say that complaints are not categorically precluded from being disclosures, right? Correct. And I understand that argument. And I'm just wondering, what would you point to specifically? I know there's a lot of stuff in this complaint, in the tenant complaint. What would you point to specifically that you think illustrates most strongly that this isn't just maybe some conclusory complaint that in fact wouldn't be a disclosure, but this one has the kind of detail and specificity and credibility, for whatever reason, that makes it a disclosure? What particular allegations, what types of things, briefly, would you emphasize to that point? Tenant says that the Blue Book is a concealed practice. And the only disclosure of the Blue Book that CHS can point to is a filing in a copyright office in 2000. Which tenant says that it was filed in a copyright office in 2000? That's a defensive point, isn't it? I mean, what is it that's in here that was the truth? That they used the Blue Book was new truth. And we could debate whether that was truth on the market. There are 42 SEC filings cited in this complaint. They make the point at footnote 21. So they had said, we don't use the Blue Book in SEC filings? No, they never disclosed the use of the Blue Book, and it was the core omission. It's an omission point, okay. Well, it is the core omission. The court's decision, Judge Sharpe's decision for the first three quarters, talks about the concealment of the Blue Book as crucial to their insider selling. He talks about the omission of the Blue Book as the crucial material omission as to paragraphs 8 and 10. He eliminates paragraph 9, the quality disclosures. But he upholds that their risk disclosures are not sufficient because they didn't disclose the Blue Book. And he upholds also that their operating efficiencies in the emergency rooms were omissions, were false by omission because they don't disclose the Blue Book. And so the disclosure of the Blue Book, but then the company admits that they use the Blue Book. What do I do with the fact the price drop, the insider selling, is just as easily explainable by the reality that when you do a hostile takeover, your stock usually, when you're the acquirer, your stock goes down. And when the complaint's filed, there looks like there's a lot of risk about whether this merger's going to happen. Those are all just, I'm not saying they're the best or most plausible. I'm just saying I don't know what to do with that. They're equally plausible. So I would say a couple things in response to that. Judge Sharp wrestled with that issue, but he made a factual error. After April 11th, there are two more increases in the offer price. That merger doesn't fail for another month. Now, you might not like that. You might say, well, the market's still thinking maybe it's going to fail, so it drops, right? But that merger doesn't fail for another month. What we know unequivocally happens on April 11th is for the first time, the market appreciates that the company uses not InterQol and not Milliman. CHS is the only hospital system to use this self-concocted thing. It immediately invites questions, so the company has to concede, yes, we use the Blue Book, but we're in the process of abandoning it. It comes out later that they're under government investigation. They have to disclose that they had not disclosed they're under government investigation. Those government investigations were probably causing it to abandon the Blue Book, which is exactly what was not disclosed, that it was unsustainable once it was subject to scrutiny. They had been told by their consultant, and this is at paragraph 101, don't ever put the Blue Book in front of a federal judge. The defendants themselves argued, and this is what the judge says, the first half of his decision is unreconcilable with his loss causation analysis, because what he says is defendants' argument is they had no duty to disclose. A broader policy question, you would agree that the corrective disclosure in this case is what makes the cause of action accrue, right? I mean, that was the last thing you needed in order for the cause of action to accrue and the limitations period to start, isn't that right? I mean, the limitations period doesn't start without the accrual of a cause of action. We're on the same page there, right? Except that you have to have sufficient information in regard to the totality of the cause of action under Merck. For Scienter, for instance. Absolutely, but that was all established. The last shoe to drop was the tenant complaint, as I understand it. And so that's why I'm focused on corrective disclosures and accrual of causes of action. So my policy point from the federal court's perspective is what's troublesome to me about making it easier to get through 12b-6 with a corrective disclosure is you incentivize earlier filed complaints rather than later filed complaints, and that's bothersome to me because I find this incredibly difficult to sort out what's going on. But the one thing I'm very confident about is time will be good to me in figuring out whether there was a lie and a correction of the lie. Time is very helpful to me on that front. So I don't see anyone getting hurt. By being tough on corrective disclosure, I don't see anyone being hurt. The only people being hurt are the people that want to file the class actions as soon as possible. I don't mind hurting them because I know if there really was a fraud, it's going to be sued. Someone's going to be able to sue on it. I'm simply delaying the accrual of the cause of action, and I'm making sure there's a real cause of action. What's not to like about that? What am I missing as a matter of the policy of when we deal with what's a corrective disclosure? I'm at a loss, Your Honor, because, in fact, we ended up with a tremendous amount of the information by virtue of being given access to the Department of Justice record. I know. And that's how it confirms my instinct. But we would not have gotten that. But for the derivative litigation, which they settled, again, without admitting or denying liability, they settled with all kinds of corporate oversight and integrity agreements for $60 million. So they settled with the government for $98 million in 2014, neither admitting nor denying. And you know the regular— So I'm understanding that's settling with the government over Medicaid or Medicare violations, right? Yes, Your Honor. Is that what you mean by that? Yes, Your Honor. Oh, that's very consistent with what I'm saying. But, Your Honor, in that settlement— I'd very much like to have that figured out because that will tell us the truth. But in that settlement, Your Honor, and, you know, Judge Rakoff really created quite a storm about admit-nor-deny settlements, and ultimately the regulatory agencies stuck to their guns that they have to be able to— It's no different than the complaint. We haven't admitted anything. It's basically allegations. We have our own economic reasons why we want this to go away. It's sort of a dressed-up complaint. And they do, Your Honor. But moreover, we don't have to establish Medicare fraud. We didn't allege that we had to establish Medicare fraud. We alleged misrepresentation by omission, and the core omission was the use of the blue book, which once it— I thought part of your lie was the statements, SEC filings, that you were—that the company was complying with state and federal law. That was one of the lies. And there was the answer that they knew they weren't. Am I wrong about that? They did know they weren't, and they had been told internally— But wasn't that part of the—isn't that part of the complaint? Isn't that one of the lies? That the SEC filings in regard to the disclosures about their risk of regulatory scrutiny were untrue at the time because internally they were told that the blue book by Zebrowitz, again, who told them don't show it to anyone, paragraph 101, he also told them— Who loses if we are tighter on corrective disclosure? Isn't it the case that as long as you link corrective disclosure to accrual, to statute of limitations, the true causes of action never get lost? Am I wrong about that? Well, Your Honor, I believe this is very vehemently— Just tell me, am I wrong or right? I mean, you could say it's irrelevant, but just tell me, am I wrong or right about that assessment? I mean, maybe it has nothing to do with how we handled this appeal, but I just would like to know, am I missing something? I don't disagree that the rules need to be more stringent on corrective disclosure, and I believe that this satisfies the rules currently on corrective disclosures under the Sixth Circuit. I don't think—there is a debate as to whether Rule 8 applies vis-a-vis corrective disclosures. We don't have to reach that here because this corrective disclosure— The third-quarter results in this instance were alleged in the initial complaint, and Judge Sharpe overlooked that, okay, and they concede that it was alleged— You answered my question. Thank you. Your initial time has expired, but you'll have your full rebuttal. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. I'm Gary Orsak, and I represent the defendants' appellees. The district court dismissed this case for lack of adequately pleading loss causation based upon a straightforward application of a rule of law that has been endorsed by every court of appeals to have addressed the issue. To your point, Judge Sutton, what the Supreme Court said about this issue in Dura was that as a function of the efficient capital markets hypothesis, in order to plead loss causation, the plaintiff must plead and then prove that the stock price dropped and the plaintiff suffered a loss when the truth becomes known. At the pleading stage, it's plead. It's pleaded. Not and prove. No, that's right, but Dura was a pleading case. My point is only that the words the Supreme Court used is that the plaintiff must plead that the stock price dropped and the loss occurred when the truth became known. Would you agree that the fraud theory that they are propounding is that community withheld or did not disclose its usage of the Blue Book? No. No, I would not. I would not. That's not the thrust of the complaint. In your view, what is it? The thrust of the complaint is that as a matter of corporate policy through a variety of means, CHS-affiliated hospitals admitted more people than it should have. It alleges that the Blue Book was a tool to do that, but it did not allege in the complaint that the fraud was a failure to disclose we used the Blue Book. Everybody agrees that under the CMS regulations, all the hospital has to have is some criteria for admitting or not admitting patients. Do you read the complaint not to allege that your client withheld or didn't disclose its usage of the Blue Book? I suppose they say that. The thrust of the complaint is that the company withheld that it had policies that don't comply with Medicare. I thought they were saying, you know, you guys are using the Blue Book. We kind of know what the Blue Book is now, and you didn't disclose that. And you're talking about, you know, I know it was somewhat a little bit later, but synergies and all this sort of business jargon as the reason for your success, whereas in fact the reason for your success is you're admitting way more people than anyone else, and you're making a lot more money from Medicare as a result. I mean, isn't that a fair summary of their theory here? I think as you just articulated it, it is. There's nothing improper about using the Blue Book or anything else, as it's agreed that 25% of all hospital companies use something other than the commercially available. Well, it depends on what's in the Blue Book. That's exactly right. That's exactly right. And so, I mean, isn't it fair to say that if the tenant complaint, I know you don't agree with this, but if that were a vehicle for disclosing to the market that community was using the Blue Book and that the Blue Book had the effect I described, isn't that a disclosure for purposes of showing loss causation? No. Why? Certainly not. Is it a coincidence that it went down 36% the next day after you guys admitted, not you guys, but community admitted they used the Blue Book? It's a coincidence that it goes down one-third? It's not remotely at issue here why the stock price dropped. As this Court held in the DE&J case, that's Judge Sutton's opinion, the fact of a stock price drop doesn't demonstrate loss causation. The definition is the stock price has to drop after the truth is revealed. But here they're saying the tenant complaint discloses community's use of this document, the Blue Book, which itself contains practices that cause community hospitals to over-admit. I mean, isn't that just a pretty straightforward theory of loss causation? It's not for two reasons. I mean, this isn't subject to a heightened pleading standard. It's just plausibility. Why isn't that a pretty plausible theory? The plausibility standard is a separate issue. This is not a Rule 8 case. Rule 8 is about notice. We can see that they've provided notice of what their theory of loss causation is. What the cases that we're relying on hold is that for there to be the revelation of truth that the Supreme Court held is required in DORA, there must be a disclosure that is capable of being received by the market as a revelation of the truth. And, of course, the prototypical one is an admission by the company. There are ways that that can happen through a third party. But it can't happen through a complaint. Okay, well, let's go where you're going. What are the other ways besides complaint? I don't mean to sort of keep – No, no, I want to hear what are the answers besides complaint. Here's my question, okay? I mean, I think in your brief you said investigative reporting can effect a disclosure, right? Sure. Let's say that the Wall Street Journal runs a story which has the detailed information in this complaint that says community is using this blue book. Here's what the blue book – the effect of the blue book is. Here are the findings of two sort of expert consultants that looked into it. We have these charts and everything, and so basically community has inflated its revenues as a result of practices that are probably unlawful. Let's say that runs in the Wall Street Journal. Same stuff, just different caption. Wall Street Journal rather than a case caption. Is that a disclosure? There are cases – Is that a disclosure? It could be. It could be. Why wouldn't it be? It depends – Same content. I understand. It depends on exactly what's said in the article. It's ad hoc, right? It's not categorical. No complaint ever can be a disclosure. It depends on what's in the complaint. No, no, I don't agree with that. A complaint by its nature is an allegation. As the courts have held, and the only district court in this circuit has held, by its nature a complaint puts investors on notice that there is a risk of fraud. A newspaper article isn't like something that a jury finds – gives us a verdict on. Sure, they don't – Why isn't that as much just sort of the reporter's allegation? I think your answer has to be – this is a very good question. I'm sitting here trying to think through it, but the only way I can think through it is to say the complaint standard is plausibility, and there's no meaningful newspaper, surely not the Wall Street Journal, that says, oh, yeah, we put out stories about plausible allegations. So that's what I would think would be going on. In fact, I would suspect if they covered this complaint, they would write the story very differently because they would talk about what's been alleged as opposed to a story that says we've got two sources for every fact, and these are the facts we found. If the newspaper article is sufficiently factual, then it can be a disclosure for these purposes.  Typically not. In the cases that have typically said – Why is that different? On the alternative grounds that we've moved for affirmance, the cases say that an investment analyst is typically putting his spin or his opinion or his view on already public information, and as the Meyer court held in the 11th Circuit, a mere repackaging or a mere view on already public information can't be a disclosure. But the policy point I wanted to get to here is that the courts have repeatedly held that if a mere allegation or rumor or statement in the market followed by the inevitable stock price drop were enough to plead loss causation, a plaintiff could get into court with the interiorum effect of discovery and the massive damages available in these cases. Any time there is some speculation or rumor or allegation in the market that affects the stock price, and as – In this case, isn't it true that your client ratified in very short order a lot of what the complaint said, namely usage of the blue book, and we're going to move away from it? And, I mean, there are a bunch of disclosures later about sort of lost revenue, but the core thing they admit – I just disagree. That's not what is pled. That's what is now being said is that the misstatement is you never told the market you were using this thing called the blue book. The allegations are that you falsely – you, the company, falsely told the market that the source of your revenues was your good business practices and synergies, et cetera. In fact, through policies coming from the top and practices, you were underusing the observation category and overusing inpatient admissions, and you did it through a whole variety of methodologies. That's what they say, and these subsequent points that they now raise are raised for the – when I say subsequent points, I mean what I think you referred to, Judge Kethledge, as follow-on concessions or disclosures. None of that – In other words, the one I was just talking about is the one that is almost the same day as the tenant complaint? Yes, that says that we do use the blue book, and then there are subsequent disclosures that say there's a DOJ investigation, et cetera. None of those was pled as a partial disclosure for the obvious reason that they were not followed by a stock price drop. They weren't argued in opposition to our motion to dismiss, and they're waived under Sixth Circuit precedent. Am I right in thinking that the lighter we are in figuring out what a corrective disclosure is, the more hurtful that is to future plaintiffs because the corrective disclosure will start the accrual clock for the statute of limitations? So in other words, not with these plaintiffs, of course, because they filed, but the lighter we make it, the earlier the accrual date is, and the earlier the accrual date, the sooner the limitations period runs. I think that's true as a simple matter of math. Okay, so next question. How do we define this? I mean, the way I look at the case is I see two schools of thought in the Court of Appeals. I see some saying allegations in an investigation or a complaint, just they're not part of the equation. They're not part of the equation, and I know that's what you're urging. But then I see others saying that by itself doesn't do the trick, but if you add it with some other things, that might be enough to get you to discovery. So I don't know what to do with that. Here's the rule of law that we advocate and that I think all the courts of appeals are actually consistent on. So by that I mean the Eleventh Circuit in the Sapsov and Meyer case, the Ninth Circuit in Luce and Lloyd, and the Fifth Circuit in Amedesis. An announcement of an investigation or the filing of a complaint on their own are never enough, and I have not found any court of appeals to say, or even any district court. They just qualified it on their own. Nothing's on its own anymore. I understand. Let me get to the qualifier. What those courts have said is that if there is a later finding of fraud, if there is a later finding of fraud, then we will treat the mere allegation or the mere announcement of an investigation as a partial disclosure, and the court in Lloyd in the Ninth Circuit explained the policy rationale for that, which I think is consistent with the concerns Judge Sutton, you expressed earlier. If we have a defendant who we know made a misstatement because the truth was revealed and it conflicts with the earlier misstatement, it would not be right as a matter of public policy to let that defendant off simply because the initial filing of the complaint or investigation, which resulted in the stock price drop, does not on its own qualify. So the rule of law, and I don't think there's a split among the courts of appeals on this, all of them hold that a mere investigation or a complaint, which is all we have here and all that was pled here, is not enough. They all say that without more, and the more, as the Meyer Court held, must be a later finding of fraud. There are some courts, Amedesis is one, where they look to see whether there are independently cognizable corrective disclosures, and there are a legion of cases, all the ones Ms. Hart cites for her argument that the Sapsov-Meyer rule is incorrect. All of those cases are ones in which there is a subsequent partial disclosure that independently qualifies. I want to come back and want to hear our perspective and your perspective on the relation back point. Sure. Because that then gets you to pleadings that address the very point you're making, right? Am I missing something? Isn't that right? On the relation back point, our position is Chief Judge Sharp correctly held that in the amended complaint filed in 2015, the new allegations described an entirely separate securities fraud, and that was, I think, effectively conceded in the motion to dismiss. But if he's wrong about that, does that become the fraud that works in connection with your statement of the law on corrective disclosures? I just want to make sure I'm not missing anything. No, it doesn't. If he's wrong about that, that there was no relation back, the plaintiff's case is that in October 2011, when the company released its third quarter earnings, that was a corrective disclosure as to the post-tenant, meaning the post-April 2011, new fraud. They alleged that new fraud to be the company saying the tenant complaint is meritless and the switch to inter-qual will not harm us. I understand. Why aren't these all just different, allegedly misrepresentations about the same fraud? Why isn't it one fraud and you have some omissions on the front end, you have some lulling post-tenant complaint, and then you have some, I guess, admissions or disclosures later on in October? Why aren't those all surrounding one fraud, namely the practices that Community was using? Two reasons. One is it was very specifically not pled that way and it was argued to the opposite. In their briefing on the motion to dismiss, page 31, and on the merits as well, they are indeed separate alleged frauds. Why? Because the initial alleged fraud, the pre-tenant fraud, is the company failing to disclose that it admits people who don't meet the Medicare and Medicaid qualifications. The post-tenant fraud, the one that they alleged out of time, said that the company wrongly announced to the market, we're switching from the Blue Book to a different inter-qual, and that's not likely to have an effect on the bottom line. And they say, we knew that was wrong when we say that. That has nothing to do, except in the highest level of generality in which everything has to do with everything. Why isn't it that Community was using certain practices that it knew would cause over-admission? It failed to disclose those practices. When the practices were outed in the tenant complaint, the company then says, well, those same practices, we're stopping them, and they didn't make any difference anyway. And then eventually they sort of come clean on the effect of the practices. Why isn't it just a series of misrepresentations or omissions about the same practices and the effect of those practices? That's what I'm struggling with. I understand the question. As I say, at a sufficiently high level of generality, you can say that they... Crazy level of generality. Well, with respect, I think it is. They're now alleging that post-tenant statements about the effect of making a switch from one criteria set to another is or is not going to have an effect has very little to do with the original allegation. But I don't want this point to get lost either. With respect to the alleged corrective, the second corrective disclosure, which they say qualifies because it's an earnings release, that utterly fails in its own right for the reason that everything they say that was disclosed at that point was previously disclosed in the second quarter filing. The company said, hey, look, the overhang of the tenant lawsuit is having more effect than we expected. What about the 7% drop in admissions? Was that already disclosed in the second quarter? In the second quarter, there was a 5.6% drop in admission. Nobody debates that statistically significant, but they ignore it. Just factually, where was that disclosed? That was in the 10-Q for the second quarter. It was publicly disclosed. There was an earnings release. And what they've said, their only response to that is, judge, you shouldn't look outside the pleadings. But these are public filings. Those filings are referenced in the complaint. And the Sixth Circuit law, as I think every other circuit I'm aware of, says that in securities litigation at the 12B6 stage, it's fair game to look at other public filings, not just the ones that the plaintiff points to. I see my time is up. I just want to say that we also dispute, and I'll just refer you to our brief, on the notion that Judge Sharpe's dismissal with prejudice was an abuse of discretion. It certainly was not for the simple reason that the plaintiffs never moved under Rule 15 to amend the complaint and never moved under Rule 59 after the judgment to amend or lift the judgment and file a new complaint. And this Court has said that it's not the district court's job to do that in the first instance, let alone the Court of Appeals' job. Okay, thank you, Counsel. Thank you. As Mr. Orsik has pointed out, everything within the SEC filings is fair game, and indeed 42 SEC filings are referenced in this complaint, and never does he lift from any of them a disclosure about the Blue Book. So he's bringing in other references to the second-quarter disclosure. He could have said the Blue Book was disclosed. Aha, it's here, it's here, it's here, 42 filings. He never says that. The best he's got is the 2,000 filing in the Copyright Office. The Copyright Office gets about a half a million copyright filings a year. There's a question whether that presents truth on the market. That would be a question of fact. I'm looking for where the complaint affirmatively says that community withheld from the market the fact of its use of the Blue Book. I mean, I see the complaint saying the Blue Book is responsible for X, Y, and Z, and it's aggressive and so on, but where does it say we didn't know about the Blue Book? And so once the tenant complaint came out and they admitted they used it, now that's a disclosure. My question is about the complaint, this complaint, the First Amendment complaint amended. I mean, where does it say the market didn't know they were using the Blue Book? I get your point about the Copyright Office, some dusty file somewhere, I get that. Precisely. Judge Sharpe says at three, he's reciting the allegations, these improper and concealed practices. We're reviewing his work here, and I'm just trying to go to the primary document here, the primary source, and nail down, okay, they allege that the market didn't know they were using this Blue Book thing. Kind of just an elementary part of the theory. And I see that, Your Honor. We alleged it. I argued it five times at the district court before Judge Sharpe. Paragraph number. Yes, I understand that. If it isn't here, then that's what you contend with. Well, thank you, Your Honor. I'm appreciating that. Paragraph eight says that Tenet revealed the use of the Blue Book, and on that same day... Well, it says it revealed their improper admissions practices. That is... I mean, if we were taking a depth here, you know this would not be like a great answer. You'd keep asking a question. At paragraph 422, on April 11, 2011, Tenet filed an anti-takeover lawsuit revealing CHS's Blue Book-based admissions practices. So we are saying that it was unrevealed because it's revealed there. On the same day, Wells Fargo said, Cash told Wells Fargo that CHS had already discontinued the Blue Book. The reason that that's being discussed on the same day is it's never been disclosed before. And at that point, CHS had discontinued it in 25 to 30 of the hospitals, and that they would convert the entire system by the end of 2011, and they alleged at that point, quote, with no material negative impact. Why wouldn't such a foundational part of the theory just be alleged expressly rather than sort of some implication in paragraph 422? Well, Your Honor, I think that the fact of the matter is we ended up understanding the true cornerstone that the Blue Book presented only after we understood how it was tied to the insider trading, for instance. They never wanted to discuss the Blue Book, because then if they were doing modifications to the Blue Book, they would have to discuss that. The defendants argued they had no duty to disclose. The whole first part of Judge Sharpe's decision is about how the defendant's argument is they had no duty to disclose the Blue Book practices. It's not a contested issue that they didn't disclose the Blue Book practices. They made two arguments. Our risk disclosures were sufficient because we talked about the fact that we might be susceptible to Medicare risk. They talked about the fact that they had no duty to disclose. Judge Sharpe rejected that, and what the issue was, no duty to disclose the Blue Book. Judge Sharpe rejected that, saying, no, you began to speak. Once you were not silent, you had a duty to fully disclose. They were told by Zebrowitz, and we say this at paragraph 101, never to put it in front of a federal judge. So they were not disclosing it, and we say why? Because they wanted to sell before the modifications would have the effect that they knew that it would have. So we come to appreciate how pivotal the Blue Book is once we have all this DOJ discovery. They disclosed ProMed. They'll tell you they disclosed ProMed. ProMed is disclosed. Blue Book is not disclosed. Blue Book was put in the pocket of every doctor in every hospital. It was by the side of every emergency room patient. It was an edict. It was a company-wide edict. That's what makes it distinct. I think you've answered my question. Thank you, Your Honor. Shall I explain Relation Back or shall I call it a day? Why don't you take about 30 seconds? Thank you, Your Honor. Relation Back on the third quarter results. So there's this without more issue that the judges in Meyer and in Sapsov in the 11th Circuit say without more a complaint cannot be sufficient because it's just allegations. We always pled more. We pled it in the initial complaint. It was at paragraph 33 and 100 to 103 that we pled the third quarter disclosures as a partial additional corrective disclosure. All we didn't plead was the stock drop. Now they're saying what they're essentially saying is because Judge Sharp made an error. They've conceded that it was an error. We did plead it in the initial complaint. Now they're saying because you didn't expand the class period, because we don't have two claims here, it's all one fraud. It's a disclosure that they misrepresented their risk and their practices. And when it comes out, they concede that they used the blue book and then they deny that it's material. But ultimately in the third quarter they disclose, yes, our abandonment of the blue book has had this impact. The analysts are surprised. And what they say is because you originally pled those facts, we were not noticed you were going to expand the class period. I'm not totally following this point, but are you saying that when you, and it goes to the without more, his response was, well, yes, there's those statements, but there's no stock price drop. So that's why it can't count as a disclosure. Are you making the point that a complaint by itself maybe can't suffice, but if a complaint with a stock drop is followed by later disclosures, that's okay, even though the later disclosures aren't accompanied by a price drop? Is that the point you're making? I'm making a couple points. Are you making that point? And was there a stock drop in the later disclosures? Yes. Why didn't you allege it? Because we were alleging it as a corroborative disclosure, and when you come into court to apply for lead plaintiff, you are dealt a certain class period. And so we allege the losses for our client and for the class based on that originally framed class period. With the benefit of the Department of Justice, so we pled that this was a corroborative disclosure. We did not know that their denials or that they were making the denials and that the migration away from the Blue Book would cause a drop. We did not have allegations on Scienter that they always knew that any change to the Blue Book, any change in their admissions protocol was going to cause a drop. We don't know that until we get the Department of Justice documents that show they talked about it for years. They sold stock timed, and Judge Sharp embraces this, ditched twice right before they modified it because they knew it would cause this drop. We don't know that until we get the Department of Justice documents. And that's why we end up making the Merck argument that that claim is timely in any event. It's not two claims. It's an expansion of the class period. We could have expanded the class period at class certification. We didn't want to wait that long because it took us five years to get before a judge, and so we didn't want to wait until class certification. You have our apologies for how long you had to wait for any kind of answer in the district court. Your Honor, I certainly don't mean that. I mean, the district court is grossly understaffed, and I think Judge Sharp really tried to do a super conscientious job. It's not about him. I mean, this obviously cycled through four different judges or something. It did, and it left us with a dilemma as to we wanted to get past the motion to dismiss, so when do we replead? And we ended up getting this discovery that allowed us to really examine the October disclosure in its full meaning. And there's an 11 percent stock drop. That's material in and of itself and caused damage to the investors. And it completes the loop. Really, that's an arc. There are denials, and the case law is quite specific indeed in the Freddie Mac case that we don't want the defendant's denials of their misconduct to facilitate them getting away with misconduct. That's what this would enable. Okay. Thank you, Ms. Hart. Thank you.